DYK, Circuit Judge,
with whom Circuit Judges NEWMAN and REYNA join, dissenting.
The majority opinion upholds sweeping claims by the Department of Defense (“DoD”) that it may take adverse actions against non-critical sensitive employees without review by the Merit Systems Pro *1167 tection Board (“MSPB” or “Board”). The effect is to effectively deny MSPB review for hundreds of thousands of federal employees — a number that is likely to increase as more positions are designated as non-critical sensitive. In my view, the DoD has acted without authority from either the President or Congress, and contrary to the Civil Service Reform Act of 1978 (“CSRA”), 5 U.S.C. § 1101 et seq.
In essence, the majority’s decision rests on the flawed premise that the DoD, acting on its own — without either Congressional or Presidential authority — has “inherent authority” to discharge employees on national security grounds. No decision of the Supreme Court or any other court supports this proposition. Whatever the policy justifications for precluding MSPB review, this is a matter for Congress (and the President), not the DoD, to determine. Ironically, the majority rests its decision on grounds of separation of powers. But the majority decision both blesses and itself engages in a violation of separation of powers principles — sustaining agency action without either Presidential or Congressional authorization, and resting its decision on its own assessment of national security requirements. I respectfully dissent.
I
As an initial matter, the majority’s decision is not mandated by, or even supported by, the Supreme Court’s decision in Department of the Navy v. Egan, 484 U.S. 518, 108 S.Ct. 818, 98 L.Ed.2d 918 (1988). The majority extends Egan to create an implied exception to MSPB review of the merits of suitability determinations for non-critical sensitive employees — here, a commissary employee (Northover) whose job required neither a security clearance nor access to classified information.[1]
In Egan, the Supreme Court held that the MSPB could not review the merits of an agency decision to deny an employee a security clearance where that employee was required to access classified information as a condition of his employment. See 484 U.S. at 520, 529, 108 S.Ct. 818. The majority extends Egan to bar the MSPB from reviewing the merits of agency determinations that employees are not suitable to hold sensitive positions. In other words, the majority extends Egan’s prohibition of MSPB merits review of the DoD’s security clearance determinations to its suitability determinations (i.e., whether an employee is eligible to hold a noncritical sensitive position).
The majority’s extension of Egan is not supported by the language of Egan itself. The Egan opinion emphasizes that it decided the “narrow question” of “whether the [MSPB] ha[d] authority by statute to review the substance of an underlying decision to deny or revoke a security clearance in the course of reviewing an adverse action.” 484 U.S. at 520, 108 S.Ct. 818. The majority’s extension of Egan marks a departure from our own prior reading of Egan and makes it unique among federal courts of appeals. We have explained that Egan “held that the [MSPB] has no authority to review the merits of a security clearance determination.” Cheney v. Dep’t of Justice, 479 F.3d 1343, 1349-50 (Fed.Cir.2007) (emphasis added) (citing Egan, 484 U.S. at 529, 108 S.Ct. 818). Other circuits have similarly characterized *1168 Egan as limited to security clearances.[2] Indeed, the Fifth Circuit recently confirmed that “[n]o court has extended Egan beyond security clearances.” Toy v. Holder, 714 F.3d 881, 885 (5th Cir.2013).
While the majority appears not to dispute that the actual holding in Egan does not support the DoD’s action here, the majority finds in the “principles” of Egan DoD authority to remove employees on national security grounds. See Maj. Op. at 1150-51, 1155. The majority concludes that there is no distinction between security clearance determinations and suitability determinations when those determinations implicate national security. In the majority’s view, because Congressional legislation does not forbid the exercise of such authority, the DoD is assumed to possess inherent authority. But neither Egan nor any other decision of the Supreme Court, this court, or any other appeals court supports this remarkable claim of inherent authority. Rather, these decisions have rejected such claims of independent agency authority.
A
First, in the Egan case, Egan did not contend that the President had failed to delegate authority to the agencies, and notably the agencies were specifically authorized by Executive Order to make “final” access determinations. There is no similar Presidential Order here. The President has not delegated any authority to the DoD to make “final” decisions with respect to suitability determinations.
The President has traditionally had special authority in safeguarding classified information, and has delegated that authority — which includes the authority to deny or revoke such access — to agencies employing such individuals. Egan recognized and relied on the President’s unique authority over classified information. The Egan court noted that the President’s “authority to classify and control access to information bearing on national security ... exists quite apart from any explicit congressional grant.” 484 U.S. at 527, 108 S.Ct. 818.
While the delegation issue was not raised in Egan, the Presidential authority was specifically delegated to the relevant agencies. Executive Orders, both at the time of Egan and later, prescribed procedures for granting and revoking access to classified information, and the agency decisions in those respects were explicitly deemed to be “final,” unreviewable decisions. See Exec. Order No. 12,968, § 5.2(a)(6), 3 C.F.R. 391 (1995 Comp.) (appeals panel within the agency makes the “final” decision), reprinted as amended in 50 U.S.C. § 435; Exec. Order No. 10,865, § 3, 3 C.F.R. 398 (1959-1963 Comp.) (allowing “an authorization for access to a specific classification category” granted by an agency to be “finally denied or revoked”), reprinted as amended in 50 U.S.C. § 435. Thus, the President unambiguously delegated to agencies determinations as to whether an employee was entitled to access classified information. The President here has claimed no such executive authority over removal of employees on national security grounds, and there is *1169 no delegation of removal authority to agencies. The majority points to no Executive Order delegating removal authority to the DoD.
While the Office of Personnel Management (“OPM”) suggests that authority can be found in Executive Order 10,450, that Executive Order confers no authority to agencies to make either final classified access or suitability determinations. In Egan the Supreme Court relied on Executive Order 10,450 for only two propositions: (1) that access to classified information could be granted only after a background investigation and (2) the standard for such access was that the access was “clearly consistent with the interests of the national security.” See Egan, 484 U.S. at 528, 108 S.Ct. 818 (citing Exec. Order No. 10,450, § 8, 3 C.F.R. 936 (1949-1953 Comp.), reprinted as amended in 5 U.S.C. § 7311). The Egan court did not rely on the Executive Order for the proposition that agencies have “final,” unreviewable authority with respect to the necessary suitability determinations at issue here — a matter that was addressed in the security clearance context by Executive Order 10,865, as referenced above. Notably, a later Executive Order specifically distinguished between 10,450 and 10,865, noting that “denial and revocation procedures” were governed by Executive Order 10,865, as amended, and not by Executive Order 10,450. See Exec. Order No. 12,968, § 7.2(c), 3 C.F.R. 391 (1995 Comp.).
Just as Executive Order 10,450 did not render determinations regarding access to classified information unreviewable, it also does not render suitability determinations unreviewable, and unlike the situation in Egan, there is no other executive order that does so. In other words, Executive Order 10,450 does not delegate to agencies either the authority to terminate access to classified information (a matter addressed in another executive order) or general removal authority where the employee is not suitable for a national security position.
To the extent that Executive Order 10,-450 deals with removal at all, the executive order does no more than provide for removal pursuant to a specific Congressional statute authorizing such removal on national security grounds, 5 U.S.C. § 7532, a provision not invoked here. See Exec. Order No. 10,450 §§ 4-6. This is confirmed by the Supreme Court’s decision in Cole v. Young, which concluded that
it is clear from the face of ... Executive Order [10,450] that the President did not intend to override statutory limitations on the dismissal of employees, and promulgated the Order solely as an implementation of the 1950 Act [i.e., § 75S2J. Thus § 6 of the Order purports to authorize dismissals only ‘in accordance with the said Act of August 26, 1950,’ [§ 7532] and similar references are made in § § 4, 5, and 1....
351 U.S. 536, 557 n. 20, 76 S.Ct. 861, 100 L.Ed. 1396 (1956) (emphasis added). At oral argument here, OPM conceded that, to the extent that Executive Order 10,450 addresses the President’s removal authority over employees, it does no more than implement § 7532.[3] As the Court in Cole further noted:
When the President expressly confines his action to the limits of statutory authority, the validity of the action must *1170 be determined solely by the congressional limitations which the President sought to respect, whatever might be the result were the President ever to assert his independent power against that of Congress.
351 U.S. at 557 n. 20, 76 S.Ct. 861. Unsurprisingly, then, OPM conceded before the MSPB that its Part 732 regulations, which “have their genesis in Executive Order 10[,]450,” did not authorize removal procedures and “are silent on the scope of an employee’s rights to Board review when an agency deems the employee ineligible to occupy a sensitive position.” J.A. 288.
In short, Executive Order 10,450 does not authorize the DoD’s actions. In contrast to the situation existing at the time of Egan, OPM can point to no other Executive Order that renders final agency decisions with respect to suitability. The lack of delegated authority with respect to suitability determinations, as opposed to security clearance determinations, is fatal to OPM’s position. The lack of such delegated authority here makes Egan inapposite, and the DoD’s actions without authority.
B
Second, the few national security and foreign affairs cases (other than Egan) on which the majority relies all involve situations in which the authority asserted was authorized by Congressional legislation or an Executive Order of the President. See, e.g., Dames & Moore v. Regan, 453 U.S. 654, 686, 101 S.Ct. 2972, 69 L.Ed.2d 918 (1981) (“[T]he President was authorized to suspend pending claims pursuant to Executive Order No. 1229k” (emphasis added)); United States v. Curtiss-Wright Exp. Corp., 299 U.S. 304, 325-28, 57 S.Ct. 216, 81 L.Ed. 255 (1936) (various statutes and joint resolutions passed by Congress authorized the President to prohibit certain exports from the United States).[4] None of those cases remotely supports agency action on national security grounds without Congressional or Presidential authority.
C
Third, as a general matter, agencies only have such removal authority as is conferred by Congressional statute. We are dealing with the DoD’s authority to remove employees for national security reasons — either by removing them from a position by demotion as here (in North-over’s case) or by discharging them from DoD employment entirely.[5] Employees such as Northover who are appointed by members of the Executive Branch other than the President can only be removed as authorized by Congressional legislation. In United States v. Perkins, 116 U.S. 483, 485, 21 Ct.Cl. 499, 6 S.Ct. 449, 29 L.Ed. 700 (1886), the Supreme Court made this clear in holding that Executive Branch employees not appointed by the President *1171 cannot be removed without Congressional authority:
[W]hen Congress, by law, vests the appointment of inferior officers [or civil service employees] in the heads of [agencies] it may limit and restrict the power of removal as it deems best for the public interest. The constitutional authority in Congress to thus vest the appointment implies authority to limit, restrict, and regulate the removal by such laws as Congress may enact in relation to the officers so appointed. The head of a[n] [agency] has no constitutional prerogative of appointment to offices independently of the legislation of Congress, and by such legislation he must be governed, not only in making appointments, but in all that is incident thereto [i.e., removals].
Id. (emphases added). There is no claim here that the DoD’s actions bypassing MSPB review were authorized by Congress.[6] Perkins is directly inconsistent with the DoD’s claim of inherent authority to discharge employees appointed by the agency without MSPB review.
This limitation on agency authority in the removal context is a manifestation of the general principle that agencies do not have independent authority apart from Congressional statute. Agencies may not act “in excess of statutory jurisdiction, authority, or limitations, or short of statutory right.” 5 U.S.C. § 706. And while the majority relies on a variety of DoD regulations to support its position, the Supreme Court has held that “[t]he rulemaking power granted to an administrative agency charged with the administration of a federal statute is not the power to make law. Rather, it is the power to adopt regulations to carry into effect the will of Congress as expressed by the statute.” Ernst & Ernst v. Hochfelder, 425 U.S. 185, 213-14, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976) (emphasis added) (quotation marks omitted).
D
Fourth, the Supreme Court has held that agencies have no authority, apart from the President and Congress, to take action on grounds of national security. The leading decision is Greene v. McElroy, 360 U.S. 474, 79 S.Ct. 1400, 3 L.Ed.2d 1377 (1959). In that case, the petitioner was removed from his job in the private sector after his required security clearance was revoked by the Secretary of the Navy, and that revocation was affirmed by the Eastern Industrial Personnel Security Board (“EIPSB”). Id. at 481-83, 489-90, 79 S.Ct. 1400. The court of appeals there determined “that the Executive Department alone [wa]s competent to evaluate the competing considerations which exist in determining the persons who are to be afforded security clearances,” id. at 491, 79 S.Ct. 1400, much like the majority does here. However, the Supreme Court found that the removal procedures established by the agency and the EIPSB “were established *1172 by ... the Secretary of Defense or the Secretaries of the Army, Navy and Air Force,” and that “[n]one [of the procedures] was the creature of statute or of an Executive Order issued by the President.” Id. at 495, 79 S.Ct. 1400. Accordingly, the majority reversed the administrative determination, concluding that,
[i]n the context of security clearance cases, ... it must be made clear that the President or Congress, within their respective constitutional powers, specifically has decided that the imposed procedures are necessary and warranted and has authorized their use. Such decisions cannot be assumed by acquiescence or nonaction. They must be made explicitly not only to assure that individuals are not deprived of cherished rights under procedures not actually authorized, but also because explicit action, especially in areas of doubtful constitutionality, requires careful and purposeful consideration by those responsible for enacting and implementing our laws. Without explicit action by lawmakers, decisions of great constitutional import and effect would be relegated by default to administrators who, under our system of government, are not endowed with authority to decide them.
Id. at 507, 79 S.Ct. 1400 (emphasis added) (internal citations omitted); see also Cafeteria & Restaurant Workers Union v. McElroy, 367 U.S. 886, 889, 893, 81 S.Ct. 1743, 6 L.Ed.2d 1230 (1961) (upholding a commanding officer’s decision to deny a cafeteria worker access to a military installation where it was “well settled that a Post Commander c[ould], under the authority conferred on him by statutes and regulations, ... exclude private persons and property therefrom” (emphasis added)). Nothing in Egan purports to overrule Greene (cited by the Egan dissent, see 484 U.S. at 536, 108 S.Ct. 818 (White, J., dissenting)), or suggests that agencies can exercise removal powers without Presidential or Congressional authorization. Rather, as noted earlier, Egan relies on the existence of Presidential — not agency — authority to determine access to classified information.
II
Quite apart from the DoD’s lack of Presidential or Congressional authority, the DoD action here is directly contrary to the CSRA, which broadly provides for review of adverse actions. Congress, by adopting specific national security exemptions from MSPB review that do not apply to North-over, has confirmed that the statutory MSPB review procedures are applicable in other circumstances. This determination is binding on both the DoD and the President.
When it enacted the CSRA, Congress created a broad statutory scheme that was designed to confer upon the MSPB extensive review authority over adverse actions affecting government employees. Sub-chapter II of Chapter 75 of the CSRA gives every “employee” the right to seek MSPB review of adverse actions, see 5 U.S.C. § 7513(d), and “employee” includes most government employees who have served in either the competitive or excepted service for at least one year. See id. § 7511(a)(1). Beyond the CSRA’s broad coverage of government employees, the act also provides the MSPB with review authority over a broad array of adverse actions, including “removals,” “suspension[s] for more than 14 days,” “reduction[s] in grade,” “reduetion[s] in pay,” and “furlough[s] of 30 days or less.” See id. § 7512. Congress made clear when it passed the CSRA that “[t]hese provisions [were to] govern any [adverse] action where the basis of the agency action is misconduct or any other cause besides unacceptable performance.” S.Rep. No. 95- *1173 969, at 46 (1978) (emphases added). The agency concedes that Northover received a demotion, which is among the enumerated adverse actions covered by the statute. See 5 U.S.C. § 7512.
Congress granted this broad authority for a reason: by providing for MSPB review, civil service employees would be “protected against arbitrary action, personal favoritism, and ... partisan political coercion” that may occur within government agencies. S.Rep. No. 95-969, at 19 (1978). The MSPB was designed as a check on both agency and OPM actions, as “[establishment of a strong and independent Board” was designed to “discourage subversions of merit principles.” Id. at 7. In fact, Congress made clear that, “[alb-sent ... [the] mandate for independence [of] the Merit Board, it is unlikely that [Congress] would have granted [OPM] the power it has or the latitude to delegate personnel authority to the agencies.” Id.
Congress has been notably aware of national security issues in the context of government employment. Congress has not created a general national security exception that places limitations on MSPB review or given agencies the authority to create such an exception. Instead, Congress created specific exceptions to deal with national security issues, balancing the needs of national security with the right to MSPB review. None of those exceptions is applicable here, and the very existence of these numerous exceptions refutes the existence of agency authority to create others.
First, implementing the decision in Egan, Congress has authorized agencies to deny access to classified information and has exempted such determinations from MSPB review. Congress, in 1994, added Title VIII to the National Security Act of 1947, granting the President authority to “establish procedures to govern access to classified information.” Intelligence Authorization Act for Fiscal Year 1995, Title VIII, § 802(a), 108 Stat. 3423, 3435 (1994) (codified as amended at 50 U.S.C. § 435(a)). The statute authorizes the President to establish “uniform minimum standards” of procedures for “employees in the executive branch ... whose access to classified information is ... denied or terminated,” see 50 U.S.C. § 435(a)(5), and makes those standards “binding upon all departments, agencies, and offices of the executive branch of Government,” id. § 435(a); see also id. § 435(a)(2) (noting that the standards govern Executive Branch employees “who require access to classified information as part of their official responsibilities”); id. § 435(a)(3) (same); id. § 435(a)(4) (referring to employees “requiring] access to particularly sensitive classified information”).[7] Consistent with Egan, the goal of the statute was to provide minimal procedural protections to employees in connection with security clearance procedures. See H.R.Rep. No. 103-753, at 54 (1994) (Conf.Rep.). The statute conferred no authority to terminate employees in non-critical sensitive positions that did not require access to classified information. Id.[8]
*1174 Second, Congress, in § 7532, conferred general authority on the heads of government agencies to remove employees where the removal “is necessary or advisable in the interests of national security.” 5 U.S.C. § 7532(b). While Egan concluded that § 7532 did not provide the sole means of ordering the. review of security clearances — a view confirmed by Carlucci v. Doe, 488 U.S. 93, 109 S.Ct. 407, 102 L.Ed.2d 395 (1988)[9] — the Supreme Court in Egan had no occasion to address national security suitability determinations or the impact of this exception on the scope of the Civil Service Reform Act as to national security suitability determinations. See 484 U.S. at 532-34, 108 S.Ct. 818.
Third, before Egan, Congress granted the director of the Central Intelligence Agency (“CIA”) plenary authority to “terminate the employment of any officer or employee of the [CIA] whenever he shall deem such termination necessary or advisable in the interests of the United States.” National Security Act of 1947, Pub.L. No. 80-253, § 102(c), 61 Stat. 495, 498 (1947) (codified at 50 U.S.C. § 403-4a(e)(1)). In 1964, similarly, Congress exempted employees of the National Security Agency (“NSA”) from MSPB review. See Act of Mar. 26,1964, Pub.L. No. 88-290, § 303(a), 78 Stat. 168, 169. These exemptions covered employees of these agencies whether or not their positions required access to classified information, and were designed to enable heads of agencies to discharge employees based on national security concerns.
Fourth, after Egan, in 1990, when Congress expanded MSPB review to the excepted service, see Pub.L. No. 101-376,104 Stat. 461 (1990), it provided that employees of the Federal Bureau of Investigation (“FBI”) as well as the CIA and NSA were exempted from MSPB review “because of their sensitive missions.” H.R.Rep. No. 101-328, at 5. In 1996, Congress expanded the exemptions from MSPB review even further to include all “intelligence components] of the Department of Defense.” 5 U.S.C. § 7511(b); see also Department of Defense Civilian Personnel Policy Act of 1996, Pub.L. No. 104-201, § 1634(B), 110 Stat. 2745, 2752 (1996). DoD did not seek, and Congress did not grant, such authority over employees in non-intelligence components of the DoD.
Then, also in 1996, Congress granted the Secretary of Defense the authority to “terminate ... any employee in a defense intelligence position,” regardless of whether the employee was part of an intelligence *1175 component, where he “determined that the procedures prescribed in other provisions of law that authorize the termination of the employment of such employee [e.g., § 7513] cannot be invoked in a manner consistent with the national security.” 10 U.S.C. § 1609(a)-(b) (emphasis added); see Department of Defense Civilian Personnel Policy Act of 1996, Pub.L. 104-201, sec. 1632(a), 110 Stat. 2745, 2748 (1996) (relevant portion codified as amended at 10 U.S.C. § 1609). These terminations are “final and may not be appealed or reviewed outside the [DoD].” 10 U.S.C. § 1609(b). Unlike § 7532, the provision “does not affect the right of the employee involved to seek or accept employment with any other department or agency of the United States if that employee is declared eligible for such employment by the Director of [OPM].” 10 U.S.C. § 1609(d).
Fifth, in 2003, Congress took further action to limit MSPB merits review of certain national security employees under Chapter 75 of the CSRA. See National Defense Authorization Act for Fiscal Year 2004, Pub.L. No. 108-136, § 1101, 117 Stat. 1392, 1621-33 (2003). The legislation empowered the Director of OPM to establish a National Security Personnel System (“NSPS”). Id. § 1101(a) (codified at 5 U.S.C. § 9902(a) (2006)). It allowed OPM to establish appeal procedures separate from the MSPB’s procedures. See id. (codified at 5 U.S.C. § 9902(h)(1)(A) (2006)). Though the MSPB review standards were to apply by default in the NSPS, Congress made clear that the standards were not to apply where “such standards and precedents [wejre inconsistent with legal standards established [by the Secretary].” Id. (codified at 5 U.S.C. § 9902(h)(3) (2006)) (emphasis added). By creating this exception, then, Congress allowed the Secretary of Defense to bypass the independent MSPB review process — and to do so with respect to any employee, including those who did not require security clearances. And that is exactly what the Secretary did.[10] However, on January 28, 2008, Congress eliminated the DoD’s authority to create a separate appeals process and invalidated those regulations that would have restricted the MSPB’s review authority. See National Defense Authorization Act for Fiscal Year 2008, Pub.L. No. 110-181, § 1106(a),(b)(3), 122 Stat. 3, 349, 356-5 *1176 7.[11]
The evolution of these numerous exceptions to MSPB review in the national security context confirm that Congress did not create or authorize a general national security exemption from MSPB review. This extensive Congressional action is quite inconsistent with the majority’s view that the DoD has inherent authority to remove employees on national security grounds without MSPB review. If the DoD had such inherent authority there would have been no need for these detailed and specific Congressional actions. There is also not the slightest suggestion in the long series of Congressional actions that it viewed the DoD as having inherent authority to remove employees on national security grounds without MSPB review. The majority’s contrary view is inconsistent with established authority holding that “ ‘[wjhere Congress explicitly enumerates certain exceptions to a general prohibition, additional exceptions are not to be implied, in the absence of evidence of a contrary legislative intent.’ ” Hillman v. Maretta, 569 U.S. -, -, 133 S.Ct. 1943, 1953, 186 L.Ed.2d 43 (2013) (quoting Andrus v. Glover Constr. Co., 446 U.S. 608, 616-17, 100 S.Ct. 1905, 64 L.Ed.2d 548 (1980)); see also TRW Inc. v. Andrews, 534 U.S. 19, 28, 122 S.Ct. 441, 151 L.Ed.2d 339 (2001) (same); United States v. Brockamp, 519 U.S. 347, 352, 117 S.Ct. 849, 136 L.Ed.2d 818 (1997) (noting that an “explicit listing of exceptions ... indicate^] to us that Congress did not intend courts to read other unmentioned ... exceptions into the statute”). Congress’s careful creation and, in one case, elimination of national security exceptions is directly inconsistent with the majority’s claim that the DoD possesses inherent authority apart from the CSRA to discharge employees on national security grounds without MSPB review.
The majority makes a specious attempt to suggest that some of these numerous Congressional actions were not motivated by national security concerns. No objective reading of these Congressional actions can avoid the conclusion that national security and employment was a matter of intense Congressional concern and that Congress legislated repeatedly in this area to accommodate these national security concerns. Neither the existence of non-security related exemptions for other agencies promulgated in the 1990 amendments to the CSRA nor Congressional concern with employee bargaining rights in repealing the NSPS should indicate that these Congressional actions were not the product of a Congressional decision to strike an appropriate balance between national security concerns and the right to MSPB review, a balance that is deeply undermined by today’s decision.[12]
*1177 III
Finally, even if the CSRA were ambiguous (which it is not), the Board (and not the DoD or OPM) is charged with administering the pertinent adverse action provisions of Chapter 75 of the CSRA. See 5 U.S.C. §§ 1204, 7701. The Board has concluded that it has jurisdiction over national security removals (not involving access to classified information), and Chevron requires that we defer to the MSPB’s interpretation of its own jurisdiction. See Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984).
In Egan, the MSPB held that it lacked jurisdiction over “underlying security clearance determination[s].” Egan v. Dep’t of the Navy, 28 M.S.P.R. 509, 514-15, 519-20 (1985). Here, in contrast, the Board, interpreting the pertinent sections of the CSRA, concluded that its jurisdiction to review adverse actions extended to review of the underlying suitability determination. Conyers v. Dep’t of Defense, 115 M.S.P.R. 572, 577, 585-86 (2010); Northover v. Dep’t of Defense, 115 M.S.P.R. 451, 456, 464 (2010). The Board reasoned that 5 U.S.C. § 1204 directs the Board to “adjudicate ... all matters within [its] jurisdiction,” and that employees subjected to adverse actions, as defined in §§ 7511 and 7512, are “entitled to appeal to the [Board] under section 7701.” See Conyers, 115 M.S.P.R. at 577; see also 5 U.S.C. §§ 1204, 7511, 7512. The Board considered and rejected OPM’s argument that it could not review the merits of national security determinations underlying adverse actions. Conyers, 115 M.S.P.R. at 578-86.
In City of Arlington, Texas v. Federal Communications Commission, which was decided after briefing in this case, the Supreme Court made clear that Chevron deference extends to an agency’s interpretation of its own jurisdictional statutes, 569 U.S. -, -, 133 S.Ct. 1863, 1868, — L.Ed.2d - (2013), holding that “no exception exists to the normal [deferential] standard of review for jurisdictional or legal question[s] concerning the coverage of an Act.” Id. at 1871 (quoting NLRB v. City Disposal Sys., Inc., 465 U.S. 822, 830 n. 7, 104 S.Ct. 1505, 79 L.Ed.2d 839 (1984)) (internal quotation marks omitted). In other cases, both our court and the Supreme Court have afforded Chevron deference to Board interpretations of the CSRA. See Cornelius v. Nutt, 472 U.S. 648, 659, 105 S.Ct. 2882, 86 L.Ed.2d 515 (1985); Garcia v. Dep’t of Homeland Sec., 437 F.3d 1322, 1338 (Fed.Cir.2006) (en banc); Tunik v. Merit Sys. Prot. Bd., 407 F.3d 1326, 1336 (Fed.Cir.2005); see also Lovshin v. Dep’t of the Navy, 767 F.2d 826, 840 (Fed.Cir.1985) (acknowledging that “deference is appropriately given to the MSPB’s interpretation of the CSRA”). Here, the Board resolved the statutory ambiguity in a formal adjudication. See Conyers, 115 M.S.P.R. 572; Northover, 115 M.S.P.R. 451. Formal adjudications are entitled to deference. See, e.g., Fed’n of Fed. Emps., Local 1309 v. Dep’t of the Interior, 526 U.S. 86, 89-90, 98-99, 119 S.Ct. 1003, 143 L.Ed.2d 171 (1999). Thus, deference is due to the Board’s interpretation of its authority, just as deference would have been due to the MSPB’s interpretation that it lacked merits review jurisdiction in Egan.
IV
.Ultimately, the majority decision rests on its policy judgment that the MSPB *1178 should not review suitability determinations based on national security. For example, the majority urges that the Board is unable to make judgments about national security issues and that the “efficiency of the service” standard implemented by the Board does not leave room for the assessment of predictive judgments as to national security. As the Board points out, while the Board cannot make judgments about security clearances, the Board is required to make judgments in a wide variety of areas as to the suitability of employees. Indeed, in several cases the MSPB has made predictive judgments as to whether an employee is suitable to hold a position, even positions that have an apparent nexus with national security and have striking similarities to the positions at issue here.[13] As with Northover, whose adverse action was taken against him on the basis of delinquent finances, the MSPB has made predictive judgments under the efficiency of the service standard on the basis of delinquent finances.[14]
At the end of the day, there may be good policy reasons to cabin MSPB review of adverse actions based on national security suitability determinations. But Congress has made a judgment to restrict, rather than eliminate, MSPB review in the area of national security. If broader authority is necessary, the affected agencies must seek such authority from Congress or the President, as they have done in the past. What agencies cannot do is claim authority when that authority has not been delegated by either Congress or the President.
V
The consequences of the majority’s decision will be profound. In the DoD alone, it will affect at least 200,000 non-critical sensitive civilian employees whose positions do not require access to security clearances, as OPM conceded at oral argument. Numerous employees in other agencies will be affected as well, as agencies other than DoD designate positions as non-critical sensitive. For example, agencies under the umbrellas of the Department of Homeland Security (such as the Transportation Security Administration), the Department of Energy, the Department of State, and the Justice Department designate positions as non-critical sensitive.[15] There are dozens of pending ap *1179 peals before the MSPB involving individuals who suffered an adverse action based on their purported ineligibility to hold a sensitive position that await our court’s disposition in this case.[16] MSPB review of these and many more such appeals will inevitably be foreclosed by the majority’s holding, even though the majority purports to limit its holding to the DoD. These appeals will involve a wide range of positions, including accounting technician and commissary positions (like those held by Conyers and Northover), as well as secretarial, human resources, contract specialist, engineering, and other positions. See supra note 16. These appeals will not just apply to removals, but will also apply to suspensions, demotions, reductions in grade or pay, and numerous other adverse actions that effectively remove employees from national security positions. See id. Meanwhile, the number of employees affected is likely to increase, as a new rule proposed by OPM would allow agencies to designate as non-critical sensitive any “[positions not requiring eligibility for access to classified information, but having the potential to cause significant or serious *1180 damage to the national security.” Designation of National Security Positions in the Competitive Service, and Related Matters, 78 Fed.Reg. 31,847, 31,849 (May 28, 2013)(to be codified at 5 C.F.R. § 1400.201(a)(l)(ii)). If positions of grocery store clerk and accounting secretary are deemed to be sensitive, it is difficult to see which positions in the DoD or other executive agencies would not be deemed sensitive.
Finally, while the majority purports to reserve the issue, the rights of these employees under Title VII and the Whistle-blower Protection Act will be affected as well, as the Board has made clear that extending Egan would “preclude Board and judicial review of alleged unlawful discrimination, whistleblower retaliation, and a whole host of other constitutional and statutory violations.” Conyers, 115 M.S.P.R. at 585. This is in accord with numerous decisions holding that such claims are precluded where the basis for agency action is the denial of a security clearance.[17]
I respectfully dissent.

. As noted in my original panel dissent, see Berry v. Conyers, 692 F.3d 1223, 1238 n. 1 (Fed.Cir.2012) (Dyk, J., dissenting), the case as to Conyers is moot. The en banc majority agrees. See Maj. Op. at 1153. While the case as to Conyers is moot, that case provides important context as to the breadth of the DoD's claim of authority. I agree with the majority that we have jurisdiction over North-over’s appeal.

. See, e.g., Rattigan v. Holder, 689 F.3d 764, 768 (D.C.Cir.2012) (noting that Egan "covers only security clearance-related decisions”); Zeinali v. Raytheon Co., 636 F.3d 544, 549-50 (9th Cir.2011) (noting that the "core holding” of Egan is that "federal courts may not review the merits of the executive's decision to grant or deny a security clearance”); Duane v. U.S. Dep't of Def., 275 F.3d 988, 993 (10th Cir.2002) ("Egan held that the Navy’s substantive decision to revoke or deny a security clearance ... was not subject to review on the merits by the [MSPB].”).

. The following exchange occurred:
The Court: [T]he Supreme Court in Cole says 10,450, insofar as it deals with the removal power, is only implementing § 7532, and it is very explicit about that.
OPM: That’s correct.
Oral Argument at 5:10-5:30.

. See also Boumediene v. Bush, 553 U.S. 723, 732-33, 128 S.Ct. 2229, 171 L.Ed.2d 41 (2008) (declining to address the question of whether the President has authority hold detainees at Guantanamo Bay but holding that the statutes giving the President authority to suspend habeas corpus ”operate[d] as an unconstitutional suspension of the writ”); Lincoln v. Vigil, 508 U.S. 182, 194, 113 S.Ct. 2024, 124 L.Ed.2d 101 (1993) (holding that an agency decision to discontinue a program was authorized by law because the action "f[ell] within the [Indian Health] Service’s statutory mandate to provide health care to Indian people”); Youngstown Sheet & Tube Co. v. Sawyer, 343 U.S. 579, 585, 588-89, 72 S.Ct. 863, 96 L.Ed. 1153 (1952) (rejecting the President’s assertion of authority to seize steel mills because "[t]he President’s power, if any, to issue [an] order must stem either from an act of Congress or from the Constitution itself”).

. In the case of Conyers, she was removed from her position by an indefinite suspension.

. The only statute that the majority cites that appears remotely relevant is 10 U.S.C. § 1564, which states that, “[fjor the purposes of" a statutory provision providing for expedited processing of background investigations for DoD security clearances, “it is not necessary for the performance of duties [of investigated employees] to involve classified activities or classified matters in order for the duties to be considered sensitive and critical to the national security.” See Maj. Op. at 1157. This provision was merely meant to prioritize some DoD background investigations for positions that require investigations, see H.R.Rep. No. 106-945, at 853 (2000) (Conf.Rep.), and does not provide any indication that Congress intended to grant authority to agencies to take adverse actions, without MSPB review, against DoD employees who do not require access to classified information.

. The executive order implementing this provision was Executive Order 12,958, which governed classified national security information. See E?ec. Order 12,958, 3 C.F.R. 333 (1995 Comp.). That executive order has since been superseded and replaced by Executive Order 13,526, 3 C.F.R. 298 (2010 Comp.).

. Along the same lines, Congress amended Title VIII in 2004 to require the President to designate an agency (ultimately, OPM) that would "conduct ... security clearance investigations of [government] employees ... who require access to classified information...." Intelligence Reform and Terrorism Prevention Act of 2004, § 3001(c)(1), 118 Stat. 3638, *1174 3707 (emphasis added) (codified as amended at 50 U.S.C. § 435b(c)(l)).

. In Carlucci, an employee of the National Security Agency ("NSA”) was terminated after the employee disclosed to the NSA that he had engaged in homosexual relationships with foreign nationals. 488 U.S. at 97-98, 109 S.Ct. 407. Though Carlucci explained (and the majority emphasizes) that the summary removal procedures of 5 U.S.C. § 7532 and 50 U.S.C. § 833 did not furnish the exclusive basis for agency removals on national security grounds, it emphasized that, apart from the summary suspension authority, the NSA had a general authority to remove employees for national security reasons under 50 U.S.C. § 831. Carlucci, 488 U.S. at 102-03, 109 S.Ct. 407; see also 50 U.S.C. § 831 (permitting the Secretary of Defense to prescribe regulations "to assure ... that no person shall be employed in, or detailed or assigned to, the National Security Agency ..., or continue to be so employed ... unless such employment ... is clearly consistent with the national security” (emphasis added)).
Thus, in contrast to this case, a specific statute conferred removal authority on the NSA, and exempted the NSA from the CSRA. See 50 U.S.C. § 831; see also Carlucci, 488 U.S. at 96-97, 109 S.Ct. 407 (noting that 50 U.S.C. § 831 was part of the NSA Personnel Security Procedures Act, which adopted separate removal procedures from the CSRA).

lo. After obtaining the statutory authorization described above, the Secretary of Defense promulgated regulations in 2005 that limited the MSPB’s authority and independence in cases that implicated national security. See Department of Defense Human Resources Management and Labor Relations Systems, 70 Fed.Reg. 66,116 (Nov. 1, 2005). Though the regulations maintained MSPB review in some form, to the extent that the MSPB retained review over adverse action appeals it was bound to interpret the implementing regulations "in a way that recognize[d] the critical national security mission of the Department.” Id. at 66,192 (codified at 5 C.F.R. § 9901.107(a)(2) (2006)); see also id. at 66,-208 (codified at 5 C.F.R. § 9901.802 (2006)) (noting that the MSPB would be bound by the legal standard set forth in § 9901.107(a)(2)).
The regulations, moreover, expressly waived and superseded MSPB appellate pro■cedures to the extent those procedures were inconsistent with other regulations. Id. at 66,208 (codified at 5 C.F.R. § 9901.803 (2006)). MSPB AJ decisions could be modified or reversed by the DoD "[w]here it [was] determined that the initial AJ decision ha[d] a direct and substantial adverse impact on the Department’s national security mission." Id. at 66,210 (codified at 5 C.F.R. § 9901.807(g)(2)(ii)(B) (2006)). The Secretary of Defense could also designate offenses as mandatory removal offenses "in his or her sole, exclusive, and unreviewable discretion” where he or she determined that the offense "has a direct and substantial adverse impact on the Department’s national security mission.” Id. at 66,190 (codified at 5 C.F.R. § 9901.103 (2006)) (emphasis added) (definition of "Mandatory removal offense”).

. The remaining statutory provisions creating the NSPS were ultimately repealed on October 28, 2009. See National Defense Authorization Act for Fiscal Year 2010, Pub.L. No. 111-84, § 1113(b)-(c), 123 Stat. 2190, 2498 (2009) (repealing the NSPS and invalidating all regulations implementing the NSPS, noting that such regulations "shall cease to be effective as of January 1, 2012”); see also National Security Personnel System, 76 Fed.Reg. 81,359 (Dec. 28, 2011) (repealing regulations implementing the NSPS effective January 1, 2012).

. With regard to the majority's suggestion that collective bargaining was the motivation for repealing the NSPS, the 2008 amendment to the collective bargaining provisions had nothing to do with the repeal of the Chapter 75 exemption authority or the repeal of the regulations restricting adverse action appeal rights. As the Department of Defense itself noted, the restoration of adverse action appeal rights to its employees was designed to "[b]ring[] NSPS under Government-wide rules for disciplinary actions and employee appeals of adverse actions.” National Security Personnel System, 73 Fed.Reg. 56,344, 56,346 (Sept. 26, 2008). The provisions of the *1177 NSPS concerning collective bargaining were contained in subsection (m) of 5 U.S.C. § 9902, whereas the provisions relating to adverse action appeal rights were contained in subsection (h), and had nothing to do with collective bargaining.

. See, e.g., Adams v. Dep’t of the Army, 105 M.S.P.R. 50, 55 (2007), aff'd, 273 Fed.Appx. 947 (Fed.Cir.2008) (upholding the Army's removal of an employee deemed unsuitable to access a computer system that "provide[d] employees with access to sensitive information” that was "not classified” and did not require a security clearance); Jacobs v. Dep’t of the Army, 62 M.S.P.R. 688, 694-95 (1994) (affirming an AJ’s decision to uphold a 30-day suspension for a security officer who protected a facility containing chemical weapons).

. See Adams, 105 M.S.P.R. at 56-57; see also James v. Dale, 355 F.3d 1375, 1379 (Fed.Cir.2004) ("The Board routinely evaluates such factors as loyalty, trustworthiness, and judgment in determining whether an employee’s discharge will promote the efficiency of the service.” (quotation marks omitted)); Cornish v. Dep't of Commerce, 9 MSPB 611, 10 M.S.P.R. 382, 383-85 (1982) (assessing an employee’s bad debt and its impact on the efficiency of the service).

.U.S. Gov’t Accountability Office, GAO-12-800, Agencies Need Clearly Defined Policy for Determining Civilian Position Requirements 31-32 (2012); National Security Position Handbook, 440-7-H, App. A (2004), available at http://www.usgs.gov/usgs-manual/ handbook/hb/440-7-h/440-7-h-appa.html; 3 U.S. Department of State Foreign Affairs Manual (2012), available at http://www.state. gov/documents/organization/84853.pdf; Department of Justice, Report No. 1-97-06, Oversight of Background Investigations by the Security and Emergency Planning Staff (1997), available at http://www.justice.gov/oig/reports/ OBD/e9706.htm.

. These cases have generally been dismissed without prejudice and will be reopened when this en banc decision is issued. See Anderson v. Dep’t of Def., No. CH0752-12-0425-I-2, 2012 MSPB LEXIS 5193 (M.S.P.B. Sept. 11, 2012) (accounting technician, removal); Brown v. Dep’t of Def., No. CH-0752-12-0405-I-2, 2012 MSPB LEXIS 6373 (M.S.P.B. Oct. 26, 2012) (accountant, removal); Cobb v. Dep’t of Def., No. CH-0752-12-0412-I-2, 2012 MSPB LEXIS 6379 (M.S.P.B Oct. 26, 2012) (accounting technician, removal); Ebrahimi v. Dep't of the Air Force, No. AT-0752-12-0763-I-1, 2012 MSPB LEXIS 5507 (M.S.P.B. Sept. 21, 2012) (electronics engineer, removal); Goodwin v. Dep’t of Def., No. CH-0752-13-0402-I-1, 2013 MSPB LEXIS 2006 (M.S.P.B. Apr. 15, 2013) (military pay technician, suspension without pay); Grimes v. Dep’t of Def., No. AT-0752-12-0334-I-2, 2012 MSPB LEXIS 5394 (M.S.P.B Sept. 17, 2012) (supervisory store associate, demotion); Hall v. Dep’t of Energy, No. AT-0752-12-0134-I-1, 2012 MSPB LEXIS 107 (M.S.P.B. Jan. 10, 2012) (courier, removal); Harris v. Dep’t of Def., No. CH-0752-12-0479-I-2, 2012 MSPB LEXIS 5232 (M.S.P.B Sept. 11, 2012) (military pay technician, removal); Ingram v. Dep’t of Def., No. DC-0752-10-0264B-1, 2012 MSPB LEXIS 4999 (M.S.P.B. Aug. 28, 2012) (supervisory commissary store associate, demotion); Kennedy v. Dep’t of Def., No. CH-0752-13-0499-I-1, 2013 MSPB LEXIS 2953 (M.S.P.B. June 4, 2013) (management and program analyst, removal); Leclerc v. Dep’t of Def., 2013 MSPB LEXIS 316 (M.S.P.B. Jan. 18, 2013) (accounting technician, suspension without pay and removal); Lewis v. Dep’t of Def., No. CH-0752-12-0542-1-2, 2012 MSPB LEXIS 5248 (M.S.P.B. Sept. 11, 20Í2) (accounting technician, removal); Mastrogiovanni v. Dep’t of Def., No. NY-0752-11-0130-I-2, 2012 MSPB LEXIS 5361 (M.S.P.B. Sept. 18, 2012) (accounting technician, removal); McFarland v. Dep’t of Def., No. CH-0752-11-0648-I-2, 2012 MSPB LEXIS 5261 (M.S.P.B. Sept. 10, 2012) (financial management analyst, removal); McFarland v. Dep’t of the Navy, No. AT-0752-11-0431-I-1, 2011 MSPB LEXIS 6527 (M.S.P.B. Oct. 17, 2011) (medical records technician, removal); Medley v. Dep’t of Def., No. DC-0752-13-0167-I-1, 2013 MSPB LEXIS 831 (Feb. 13, 2013) (human resources specialist, demotion); Morgan v. Dep’t of Def., No. PH-0752-12-0343-I-3, 2013 MSPB LEXIS 793 (Feb. 12, 2013) (accounting technician, removal); Quarles v. Dep’t of Def., No. CH0752-120451-I-2, 2012 MSPB LEXIS 5251 (M.S.P.B Sept. 11, 2012) (contact representative, removal); Sawyer v. Dep’t of the Air Force, No. AT-0752-12-0249-I-1, 2012 MSPB LEXIS 5298 (M.S.P.B. Sept. 10, 2012) (contract specialist, removal); Scott v. Dep’t of Def., No. CH-0752-12-0579-I-2, 2012 MSPB LEXIS 6376 (M.S.P.B. Oct. 26, 2012) (secretary, removal); Sohn v. Dep’t of the Navy, No. SH-0752-12-0639-I-1, 2012 MSPB LEXIS 6610 (M.S.P.B. Nov. 6, 2012) (electronics engineer, indefinite suspension); Spivey v. Dep’t of Def., No. CH-0752-13-0361-I-1, 2013 MSPB LEXIS 1846 (M.S.P.B. Apr. 4, 2013) (military pay technician, removal); Warner v. Dep't of Def., No. CH0752-13-0228-I-1, 2013 MSPB LEXIS 629 (M.S.P.B. Feb. 1, 2013) (accounting technician, removal); Williams v. Dep’t of Def., No. CH-0752-12-0416-I-2, 2012 MSPB LEXIS 5327 (M.S.P.B. Sept. 11, 2012) (military pay technician, removal).

. See El-Ganayni v. U.S. Dep’t of Energy, 591 F.3d 176, 184-86 (3d Cir.2010) (holding that a plaintiff could not prevail on his First Amendment and Fifth Amendment claims where he alleged his security clearance had been revoked in retaliation for constitutionally protected speech or based on his religion or national origin); Bennett v. Chertoff, 425 F.3d 999, 1003 (D.C.Cir.2005) (“While [the plaintiff] claims that [the agency’s] security clearance explanation is pretextual, ... a court cannot adjudicate the credibility of that claim.”); Hesse v. Dep’t of State, 217 F.3d 1372, 1377-80 (Fed.Cir.2000) (holding that the MSPB lacks jurisdiction where a petitioner alleges that his security clearance had been revoked in retaliation for whistleblowing); Perez v. FBI, 71 F.3d 513, 514-15 (5th Cir.1995) ("Because the court would have to examine the legitimacy and the possibly pretextual nature of the [agency’s] proffered reasons for revoking the employee's security clearance, any Title VII challenge to the revocation would of necessity require some judicial scrutiny of the merits of the revocation decision.” (footnote omitted)); Brazil v. U.S. Dep’t of the Navy, 66 F.3d 193, 196 (9th Cir.1995) (noting that "a Title VII analysis necessarily requires the court to perform some review of the merits of the security clearance decision”).